120          August 12, 2015          No. 16

IN THE OREGON TAX COURT
REGULAR DIVISION

WINCO FOODS, LLC,
*Plaintiff,*
*v.*

MARION COUNTY ASSESSOR
and Department of Revenue,
*Defendants.*

(TC 5222)

Plaintiff (taxpayer) appealed to the Magistrate Division as to real market value (RMV) of its distribution center in Woodburn, Oregon. The matter was held in abeyance until the resolution of a Regular Division case involving the property for a prior tax year (TC 5013). This case was then specially designated to the Regular Division. The parties were separated by a substantial amount in their estimations of RMV. Both appraisers relied on the comparable sales indicator of value for land and the cost indicator of value for buildings, structures and site improvements. Neither appraiser developed any deduction for external or economic obsolescence for the improvements. There were five major areas of disagreement, which included land value, estimated replacement costs, replacement cost new, physical depreciation and functional obsolescence. Following trial, the court found that on balance, with regard to those areas, the court considered the analysis of the appraiser for the taxpayer to be more persuasive and adopted those conclusions.

Trial was held February 23 and 24, 2015, in the courtroom of the Oregon Tax Court, Salem.

Brad S. Daniels, Stoel Rives LLP, Portland, argued the cause for Plaintiff (taxpayer).

Scott A. Norris, Marion County Counsel, Salem, argued the cause for Defendant Marion County Assessor (the county).

Decision for Plaintiff rendered August 12, 2015.

**HENRY C. BREITHAUPT, Judge.**

### I.   INTRODUCTION

This property tax case presents the question of the real market value (RMV) of land and improvements located in Woodburn, Oregon, and operated as a grocery distribution center.

## II.   FACTS

The land in question consists of approximately 80 acres located just south and west of the interchange between Highway 219 and Interstate 5.

The buildings and structures that make up the improvements include a grocery distribution facility of approximately one million square feet, which includes dry storage, perishable food storage, refrigerated storage and office space. Also on the land is a product return building and truck wash. Finally, the site has been improved with asphalt and concrete paving, a water tank and pump house, a gate house, and perimeter fencing.

Other more particular facts will be discussed within the areas of disagreement between the parties, insofar as the facts relate to the matter underlying the disagreement.

## III.   ISSUE

As stated above, the issue for decision is the real market value of the subject property as of January 1, 2010.

## IV.   ANALYSIS

Plaintiff (taxpayer) presented a report and related testimony of an appraiser. Defendants are the Marion County Assessor (the county) and the Department of Revenue (the department). The county presented its case at trial through a report and testimony of an appraiser.

The appraisers are separated by a substantial amount in their estimations of RMV. The major areas of disagreement are, however, relatively few and the appraisers agree on substantial matters. Both appraisers rely on the comparable sales indicator of value for land and the cost indicator of value for buildings, structures and site improvements. Neither appraiser developed any deduction for external or economic obsolescence for the improvements.

This analysis will be organized according to the areas of major disagreement in the work of the two appraisers.

A. *Land Value*

In estimating land value, each appraiser employed the comparable sales indicator. Both agreed that the best comparable was a sale of approximately 50 acres of land located near Salem, Oregon, upon which a "big box" retail store was to be constructed.

As is true in all cases, the "comparable" land is not entirely comparable to the subject land. The comparable is located at a greater distance from Interstate 5. It is smaller in area. It does not appear to suffer from flooding problems to the extent that taxpayer demonstrated the subject land suffers from such problems.

In addition, in the transaction in which the "big box" retailer purchased the comparable land, there were post-sale expenditures that were known to the buyer and seller and which effectively increased the purchase price of the property.

The appraiser for the county also added additional items to his estimation of cost of the subject property related to system development charges and other items of cost that taxpayer had incurred when it had initially purchased the subject property. One such item was additional cost that taxpayer experienced due to inclement weather that occurred at the time of the purchase and improvement of the subject property.

The court finds that there is no basis for adding the system development charges or items such as inclement weather costs to any cost indicator for the subject property. The appraiser for the county did not provide the court with any authority or logic for such an addition and the court is unaware of any such authority or logic. In addition, the appraiser for the county did not adequately consider the problems with flooding that were shown to have affected the subject property but not the comparable property in Salem.

That said, taxpayer was in error in not adding to the cost of the comparable property sale in Salem the amount of post-sale obligations.

The court considers the property in Salem to have been a rough comparable. Adjusting the stated sale price upward for post-sale obligations and taking a deduction from that price for the favorable position of such property as to flooding, the court concludes that the proper value for the land is $2.45 per square foot. That value produces an overall land value of $8,556,970 for the land area of 3,492,641 square feet.

B. *Estimation of Replacement Costs for Buildings and Structures*

The property in question was originally constructed in 1997. It was expanded and remodeled in 1998, 2003, and 2008. Credible testimony by taxpayer's appraiser indicates the additions and remodeling was a response to changes in the types of foods that needed to be stored, that change itself occasioned by changes in ultimate consumer demand. Those changes in consumption patterns also rendered portions of the dry storage space unnecessary.

Other changes were occurring in the grocery warehouse world as well. As detailed by taxpayer's appraiser, consolidation was occurring in the grocery industry. This had consequences for the design of grocery warehouse facilities. One result of that consolidation was that economies of scale in central office functions were produced, rendering portions of the office space at the subject property unnecessary.

Both of these changes were recognized and discussed in credible fashion by taxpayer's appraiser. The appraiser for the county disagreed with these conclusions but had little in the way of factual support for his disagreement. The court finds the analysis by the taxpayer's appraiser to be persuasive.

A significant consequence of this conclusion is that the court also accepts the analysis of taxpayer's appraiser that excess capital costs existed in the subject property as of January 1, 2010. These excess costs were related to excess dry storage and excess office space.

This conclusion has a major effect on the persuasiveness of what the appraisers did in calculating the cost

indicator for the subject property. The appraiser for tax-payer took the excess property into account in calculating replacement cost. He did not replace the unneeded spaces.

On the other hand, the appraiser for the county, while purporting to calculate a replacement cost indicator, in effect produced a reproduction cost result. The court does not accept either the appraiser's premise that there were not excess capital costs or his result that a reproduction cost is the appropriate starting point for cost calculations.

As to the next step of cost calculation, the appraiser for taxpayer employed the cost comparable method, using as a data base, subject to adjustments for location, the actual costs incurred by taxpayer in constructing a grocery distribution warehouse in Boise, Idaho, very close to the assessment date. The appraisers were in agreement that cost comparables for actual construction near the assessment date is the best data to use.

The assessor for the county did not, however, use the cost comparable data available from the construction in Boise. He rejected that data because he identified a cost component of approximately six million dollars in site costs that appeared not to have been included in the data. The appraiser for the county does not appear to have made any attempt to investigate this matter. The record indicates that had he done so, an explanation would have been available. Indeed, the appraiser for taxpayer, upon learning of the problem himself, made an appropriate correction upward in his conclusion of value.

The appraiser for the county developed his cost indicator using secondary summary information available from Marshall Valuation Service (MVS). When called upon to explain how data is compiled and processed by MVS, the appraiser for the county was unable to provide any explanation. Even if he had done so, his reliance on such information as opposed to the superior data from a cost comparable demonstrates that his cost information is not nearly as persuasive as that used by the appraiser for taxpayer.

Accordingly, the court accepts the calculation of taxpayer's appraiser as to the appropriate replacement cost

new for the subject property. Additionally, notwithstanding an objection by the county on this point, taxpayer's approach is perfectly acceptable in arriving at a cost for what would have been built as a facility as of January 1, 2010.

There is no need, as the county appears to argue, to first calculate a replacement cost for the facility as it existed on that date and then take a subtraction for functional obsolescence. The authoritative appraisal text recognizes that one virtue of the replacement cost approach is that excess capital costs are automatically excluded in the calculation of replacement cost.[1]

The court also accepts the position of the taxpayer's appraiser as to allocation of soft costs among the component parts of the subject property.

C. *Replacement Cost New for Site Improvements and Machinery/Equipment*

The comments and analysis applicable to the determination of replacement cost new for buildings and structures apply as well to site improvements and machinery/equipment. The conclusion of the appraiser for taxpayer is accepted.

D. *Physical Depreciation*

Both appraisers estimated physical depreciation and added to that amount an amount for functional obsolescence. Notwithstanding this fact, the county criticizes taxpayer's appraiser for doing this, never explaining why it is appropriate for its appraiser but not for the taxpayer's appraiser. The court sees nothing wrong with the procedure employed by both appraisers—calculation of physical depreciation using an age/life method with an additional deduction for operational functional obsolescence.

That said, the question remains as to which calculation of physical depreciation is more persuasive. On this question there is little doubt. The appraiser for the county was completely unaware of major problems with important

---

[1] "The use of replacement cost can eliminate the need to measure some, but not all, forms of functional obsolescence such as superadequacies and poor design." Appraisal Institute, *The Appraisal of Real Estate* 570 (14th ed 2013).

components of the subject property. The record indicates significant and easily observable problems with the roof on the property, the ammonia piping involved in the refrigeration system, the concrete floors in the building and the asphalt surrounding the warehouse. The fact that the appraiser for the county was unaware of these facts and did not take them into account makes it impossible for the court to rely on the opinion of this appraiser as to physical depreciation for the buildings and structures.

As to site improvements and machinery/equipment, the lack of appreciation for the asphalt problem renders the analysis of the county's appraiser unreliable. As to machinery and equipment, that appraiser appears to have relied on general schedules and limited conversations with equipment vendors as to the useful life of property.

The court considers the analysis of the appraiser for the taxpayer to be more persuasive on this issue and adopts that conclusion.

The position of the appraiser for the taxpayer as to physical depreciation on all elements of the subject property is accepted as persuasive.

E.   *Functional Obsolescence*

As stated above, both appraisers took an additional deduction from replacement cost new for functional obsolescence related to operating inefficiencies. That approach, coupled with an age/life approach to the property generally is not inconsistent with the authoritative texts that, like the appraisers here, conclude that the age/life and obsolescence breakdown elements can be combined.

The problem in this case relating to functional obsolescence relates to the fact that the subject property was constructed over time and additions to the property were made such that inefficiencies in operation were created. Both appraisers recognized that this had occurred and needed to be addressed.

The appraiser for the county, without any explanation, concluded that the inefficiencies warranted an additional deduction of five percent.

The appraiser for taxpayer considered the nature of the inefficiencies, concluding that the traffic pattern in loading and unloading material led to additional operating costs. The appraiser then quantified the burden that the inefficiencies placed on the property in terms of additional cost over time and concluded to a deduction for obsolescence. The county did not establish that this approach was faulty.

The court cannot accept an unexplained conclusion when analysis of operating facts and their economic consequences are offered to the court as an alternative. The calculation of economic obsolescence done by the appraiser for taxpayer is accepted, as well as the allocation of that deduction among the components of the subject property.

## V.   CONCLUSION

Except for an adjustment to the land value calculated by the appraiser for taxpayer, as explained above, the conclusion of that appraiser as to RMV as of January 1, 2010, is accepted and found by the court to have been the RMV of the subject property as of that date.

Counsel for taxpayer is directed to submit an appropriate form of judgment.

Costs are awarded to Plaintiff. Now, therefore,

IT IS THE DECISION OF THIS COURT that the RMV of the subject property as of January 1, 2010, was as calculated by appraiser for Plaintiff as described above.